UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOLMETEX, LLC, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION |
| | ) |
| v. | ) NO. 4:15-CV-40144-TSH |
| | ) |
| DENTALEZ, INC., RAMVAC DENTAL | ) |
| PRODUCTS, INC., AND APAVIA, LLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 2)**

**December 10, 2015**

**HILLMAN, D.J.**

Plaintiff moves to preliminarily enjoin Defendants from marketing and selling any product used for the collection of amalgam in dental wastewater streams under the name "HOG." For the reasons set forth below, this motion is ***denied***.

**Background**

The following facts are taken from Plaintiff's verified complaint and the exhibits submitted by both parties. SolmeteX, LLC (Plaintiff) manufactures and distributes amalgam separators that are used to remove amalgam filling particles from dental wastewater streams. Plaintiff owns two federally registered trademarks associated with its brand of amalgam separators, called the "Hg5." Apavia, LLC (Apavia) recently began producing a competing amalgam separator, which is distributed by RAMVAC Dental Products, Inc. (RAMVAC) and DentalEZ, Inc. (DentalEZ) under

1

the name "Amalgam HoG."[1] Plaintiff believes that, by using the word "HoG," Apavia, RAMVAC, and DentalEZ (collectively, Defendants) have intentionally copied the fundamental appearance and elements of the Hg5 marks.

Plaintiff introduced the Hg5 approximately fifteen years ago. It has since been endorsed by state dental associations and has received numerous industry awards. Plaintiff maintains two federal registrations for the word and design of the Hg5 mark. Specifically, Plaintiff owns U.S. Patent and Trademark Office (USPTO) registration number 2,560,362 for the word mark "HG5" in International Class 11 for an "amalgam separator for the removal of mercury and other contaminants from waste streams" (the word mark). It also owns USPTO registration number 2,623,925 for a design mark in the same International Class, covering the same use, and utilizing the same three-letter arrangement: "Hg5" (the design mark). Both marks were registered in 2002 and have been continuously used in interstate commerce since 2000.

The registration document for the design mark contains the following image: . As this image shows, the "5" is much smaller than the letters, it is enclosed in a circle, and it is placed directly above the "g." The registration document also contains the following description of the design mark, which further specifies its appearance:

> The mark consists of the letters "HG" in gray on a black background with black shading diagonally through the "HG" lettering. The black background is outlined in maroon. Above the letter "G" is the number "5" in blue on a circular black background surrounded with a maroon outline. Below the letter "H" are the words "mercury removal strategies for today's dental practice" all in blue imposed upon the black background of the mark.

---

[1] DentalEZ claims that it is affiliated with RAMVAC but does not sell or distribute the new amalgam separator at issue in this case. The exhibits do not clarify this assertion. Because the instant motion is denied, I need not presently attempt to define DentalEZ's relationship with the other Defendants.

Plaintiff contends that, since introducing the Hg5 line of amalgam separators, it has always referred to its product using a capital "H" and lowercase "g," followed by a "5" sized to match the "H," as in "Hg5."

Plaintiff believes that Apavia was formed with the help of a rogue SolmeteX executive who conspired to steal Plaintiff's trade secrets, for the purpose of using the information to create an amalgam separator to compete with the Hg5. An action between SolmeteX and Apavia for theft of trade secrets is currently pending in state court. DentalEZ and RAMVAC are former authorized resellers of Plaintiff's Hg5. From April of 2003 until April of 2014, RAMVAC marketed and distributed a RAMVAC version of the Hg5, which it sold under the name "DentalEZ 'RAMVAC Hg5.'" With Plaintiff's permission, descriptions of the RAMVAC Hg5 unit featured RAMVAC's name alongside Plaintiff's Hg5 design mark, as follows: . As recently as April of 2014, RAMVAC was promoting the Hg5 through its website.

According to Plaintiff, Defendants unveiled the new "Amalgam HoG" in February of 2015 at the Chicago Dental Society's Mid-Winter Meeting. The Amalgam HoG is an amalgam separator designed and manufactured by Apavia, with replacement containers designed to fit existing Hg5 installations. The Amalgam HoG is the only non-Hg5 amalgam separator on the market that retrofits directly onto the Hg5 system. The Amalgam HoG logo appears as follows:

Plaintiff contends that Defendants are now intentionally trading on its longstanding goodwill in the Hg5 marks, which the dental community had previously associated with DentalEZ and RAMVAC because of their history as Hg5 resellers. RAMVAC has historically marketed other dental supply products under animal names such as "Badger," "Bison," "Otter," "Bulldog,"

3

and "Owl."[2]  But, unlike the other animal-themed products, when naming the "Amalgam HoG" Defendants chose to capitalize the "H" and the "G," while leaving the "o" lowercase, making the word visually similar to "Hg5."  Plaintiff further notes that, although Defendants' product's full name is the "RAMVAC Amalgam HoG, powered by Apavia," Defendants' marketing materials sometimes refer to it simply as "the HoG," emphasizing its similarity to the Hg5.

After a cease-and-desist letter failed to accomplish its requested relief, Plaintiff brought the instant suit against Defendants on October 19, 2015, asserting the following counts: trademark infringement in violation of 15 U.S.C. § 1114 (count I); false designation of origin in violation of 15 U.S.C. § 1125(a) (count II); state law trademark infringement in violation of Mass. Gen. Laws ch. 110H, § 13 (count III); state law trademark dilution in violation of Mass. Gen. Laws ch. 110H, § 13 (count IV); and violation of Mass. Gen. Laws ch. 93A, § 11 (count V).

Plaintiff also moves for a preliminary injunction, seeking to enjoin Defendants from "selling, marketing, advertising, or distributing any product used in the collection of amalgam waste in dental waste water streams using a tradename or mark based on the word 'HOG,' irrespective of the manner of capitalization."  Plaintiff also seeks injunctions requiring Defendants to remove markings and labels bearing the name "HOG" from all products associated with Apavia's amalgam separator, and to cease using the term "HOG" in promotional materials.

## Standard of Review

Traditional equitable principles govern a request to preliminarily enjoin alleged trademark infringement. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 34 (1st

---

[2] These names are suggestive of the products' functions.  For example, the "Owl" is a backlit touchscreen control pad, and the "SlugBuster" is a dental vacuum line cleaner.  Similarly, "HoG" is suggestive of the product's purpose because the separator "eats" amalgam from dental wastewater.

Cir. 2011). "A preliminary injunction is an extraordinary and drastic remedy . . . never awarded as of right." *Id.* at 32 (quoting *Munaf v. Geren,* 553 U.S. 674, 689-90 (2008)) (quotation marks and citation omitted). A plaintiff seeking preliminary injunctive relief must show (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Id.*; *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

The first element, likelihood of success on the merits, is especially important in trademark cases "because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006).[3] However, for purposes of a preliminary injunction, the trademark holder need only show a *likelihood* of success on the elements of its infringement claim, and the "court's conclusions as to the merits of the issues presented . . . are to be understood as statements of probable outcomes" rather than final determinations. *Id.* at 116 (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)).

---

[3] Historically, the First Circuit applied a presumption in this regard, holding that "a trademark plaintiff who demonstrates a likelihood of success on the merits creates a presumption of irreparable harm." *Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson–Powell,* 129 F.3d 1, 3 (1st Cir. 1997) (citing to examples). However, the validity of this rule was called into question by the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006); *see Voice of the Arab World, Inc.*, 645 F.3d at 32. The First Circuit has since declined to decide whether the presumption of irreparable harm in infringement cases violates the holding in *eBay*. *See Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 54 (1st Cir. 2013); *Voice of the Arab World, Inc.*, 645 F.3d at 34.

**Discussion**

*1. Likelihood of Success on the Merits: Federal Trademark Infringement*

Plaintiff's primary allegation with regard to the instant motion is trademark infringement in violation of 15 U.S.C. § 1114 (count I).[4]  As a threshold matter, Defendants are under the impression that Plaintiff's motion applies only to its claim of infringement on the "HG5" word mark.  However, Plaintiff's motion clearly alleges that Defendants are infringing on both the design and word marks.  Accordingly, I will consider Plaintiff's likelihood of success on the merits of its infringement claim with regard to each of its marks.

"The purpose of a trademark is to identify and distinguish the goods of one party from those of another.  To the purchasing public, a trademark signi[fies] that all goods bearing the trademark originated from the same source and that 'all goods bearing the trademark are of an equal level of quality." *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 60 (1st Cir. 2008) (quoting *Colt Def. LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701, 705 (1st Cir. 2007)) (citation and quotation marks omitted).  The Lanham Act creates a federal cause of action for trademark infringement of both registered and unregistered marks. *See* 15 U.S.C. § 1114(1)(a) (registered); § 1125(a)(1)(A) (unregistered); *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1301 (2015).

Here, Plaintiff brought its infringement claim under 15 U.S.C. § 1114(1)(a), which applies to infringement of registered marks and provides in pertinent part as follows:

---

[4] Plaintiff has also alleged false designation of origin in violation of 15 U.S.C. § 1125(a); state law trademark infringement in violation of Mass. Gen. Laws ch. 110H, § 13; and state law trademark dilution in violation of Mass. Gen. Laws ch. 110H, § 13.  Plaintiff has not presented arguments for likelihood of success on these claims in the context of its motion for preliminary injunctive relief.

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;
> . . .
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Thus, Plaintiff must prove two elements in order to succeed on its infringement claim: "(1) that its mark merits protection and (2) that the allegedly infringing use of its mark is likely to result in consumer confusion." *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 49 n.1 (1st Cir. 2013) (citing *Borinquen Biscuit Corp.*, 443 F.3d at 116). As explained below, I find that Plaintiff is likely to succeed on the first element but is not likely to succeed on the second element. Overall, I find that Defendants are likely to prevail on the federal infringement claim.

### A. *Whether the Hg5 Marks Merit Protection*

"[I]n order to be eligible for trademark protection, a mark must qualify as distinctive." *Borinquen Biscuit Corp.*, 443 F.3d at 116. The distinctiveness standard engenders a taxonomical classification, in which marks are categorized "along a continuum of increasing distinctiveness." *Id.* This continuum contains five categories of marks: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* Generic marks can never be distinctive, whereas "suggestive, arbitrary, and fanciful marks are considered inherently distinctive." *Id.* Descriptive marks fall somewhere in the middle. "Descriptiveness and distinctiveness are neither congruent concepts nor productive of mutually exclusive classifications. Descriptive marks are tentatively considered non-distinctive but can attain distinctive status upon an affirmative showing of secondary meaning." *Id.* The showing of secondary meaning "requires the trademark holder to establish that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather

than the product itself.'" *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n.11 (1982)).

When a trademark is federally registered, this registration becomes "prima facie evidence of the validity of the registered mark." *Id.* at 117 (quoting 15 U.S.C. § 1115(a)). When the USPTO "registers a mark without first requiring the applicant to prove secondary meaning, the holder of the mark is entitled 'to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive.'" *Id.* (quoting *Equine Techs., Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 545 (1st Cir. 1995)).[5] The effect of this presumption varies depending on whether the registered mark has become incontestable. Once a mark has attained incontestable status pursuant to section 1065 of title 15, the presumption of distinctiveness becomes conclusive. *Id.*; 15 U.S.C. § 1115(b). The statutory requirements for incontestability require that the mark is currently in use and has been in continuous use in interstate commerce for five consecutive years after the date of registration, provided that there has been no successful challenge to the ownership of the mark. § 1065. Additionally, the registrant must file an affidavit with the USPTO stating that these requirements have been satisfied. § 1065(3).

If a registered mark remains contestable, the defendant may defend an infringement suit on the ground that the mark is not inherently distinctive and, therefore, does not merit protection. *Borinquen Biscuit Corp.*, 443 F.3d at 117; *see* § 1115(a). Thus, "the effect of registration for a contestable mark is 'to shift the burden of proof from the plaintiff . . . to the defendant, who must introduce sufficient evidence to rebut the presumption of the plaintiff's right to [exclusive] use' through proof that the mark is merely descriptive." *Borinquen Biscuit Corp.*, 443 F.3d at 117

---

[5] Even if a registrant is required to submit proof of secondary meaning to the USPTO, the holder will still be entitled to a presumption of validity through acquired, if not inherent, distinctiveness. *Borinquen Biscuit Corp.*, 443 F.3d at 117 n.2; *see* 15 U.S.C. § 1115(a).

(quoting *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 373 (1st Cir. 1980)). However, "a putative infringer must offer significantly probative evidence to show that the mark is merely descriptive. . . . Simply *alleging* descriptiveness is insufficient . . .; the putative infringer must *prove* descriptiveness by a preponderance of the evidence . . . ." *Id.* at 118 (emphases in original). If the defendant meets this burden, the plaintiff is then tasked with proving that the mark has acquired secondary meaning. *Id.*

Here, Plaintiff asserts that the Hg5 marks are incontestable and are, therefore, entitled to a conclusive presumption of distinctiveness and validity. The Hg5 marks are currently in use and have been in continuous use since their registrations in 2002. However, on this record I cannot find that the marks have attained uncontestable status, because Plaintiff has not shown or alleged that it filed the requisite affidavits with the USPTO. Nevertheless, the marks are registered, which entitles them to a rebuttable presumption of validity. *See* 15 U.S.C. § 1115(a).

Defendants argue that Plaintiff's marks are descriptive and therefore weak, because the term "Hg" refers to the element mercury, which is an element that amalgam separators remove from dental wastewater. However, Defendants have not presented anything beyond allegations with regard to the descriptive nature of Plaintiff's marks.[6] More is required to rebut the presumption of validity. *See Borinquen Biscuit Corp.*, 443 F.3d at 118. Accordingly, I find that Plaintiff is likely to succeed on the first element of the infringement claim.

### B. *Likelihood of Consumer Confusion*

In addition to showing that its mark merits protection, a successful trademark infringement plaintiff "must demonstrate that the defendant used an imitation of its protected mark in commerce

---

[6] For example, evidence of descriptiveness could take the form of surveys showing that consumers regard the mark as being merely descriptive of the plaintiff's product. *Borinquen Biscuit Corp.*, 443 F.3d at 118 n.4.

in a way that is 'likely to cause confusion, or to cause mistake, or to deceive.'" *Swarovski Aktiengesellschaft*, 704 F.3d at 48-49 (citing 15 U.S.C. § 1114(1)(a)). Likely confusion means "'more than the theoretical possibility of confusion.' . . . In other words, the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008) (quoting *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.,* 103 F.3d 196, 200-01 (1st Cir. 1996)).

In the First Circuit, the likelihood of confusion is evaluated through the eight-factor analysis set forth in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482 (1st Cir. 1981). The eight *Pignons* factors are: "(1) the similarity of the marks, (2) the similarity of the goods, (3) the relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) the evidence of actual confusion, (7) the defendant's intent in adopting the mark and (8) the strength of the plaintiff's mark." *Swarovski Aktiengesellschaft*, 704 F.3d at 49 n.2 (citing *Pignons,* 657 F.2d at 487-91). "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 10 (1st Cir. 2012) (quoting *Borinquen Biscuit Corp.,* 443 F.3d at 120).

I find that Plaintiff is likely to succeed on three of the eight *Pignons* factors. Defendants are likely to succeed on four factors, and one factor is neutral. Overall, I find that Plaintiff is not likely to succeed on its infringement claim. The factors weighing in favor of Defendants are sufficient to allay any substantial likelihood of confusion among an appreciable number of consumers. *See Boston Duck Tours, LP*, 531 F.3d at 12.

i.   *Similarity of the Marks*

The degree of similarity between the marks is the "single most important factor in determining likelihood of confusion." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 367 (3d Cir. 2007) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000)). Moreover, the similarity of the marks takes prominence when, as is the situation here, the goods are direct competitors in the marketplace. *See Boston Duck Tours, LP*, 531 F.3d at 30 (citing *McNeil Nutritionals, LLC*, 511 F.3d at 367). Regarding both word marks and design marks, "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Id.* at 29 (quoting *Pignons,* 657 F.2d at 487) (citation omitted). For design marks, similarity of appearance is controlling. *Id.* (citing 4 *McCarthy on Trademarks and Unfair Competition* § 23:25 (4th ed.)). "Even if elements of each party's mark overlap, or are visually similar, the marks as a whole may still create a distinct commercial impression, especially if the similarities are limited to generic or descriptive elements." *Id.*[7]

Plaintiff argues that "Hg5" and "HoG" are similar because they each contain three letters, they each contain an "h" and a "g," and they each contain a small character sandwiched between two larger characters. Defendants, on the other hand, argue that the marks are not similar at all. They present a side-by-side comparison of the Amalgam HoG logo and the printed characters "Hg5" to illustrate the significant differences. Defendants also assert that they do not use "HoG"

---

[7] It is also true that "otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 204 (1st Cir. 1996). Here, however, the names of RAMVAC and DentalEZ have been associated with both the Hg5 and the Amalgam HoG. Thus, to the extent that these names now appear in the context of the Amalgam HoG, this appearance would not necessarily dispel confusion.

as a standalone mark; rather, it is part of a logo that consists of the phrase "Amalgam HoG Powered by Apavia" and includes a picture of a hog's head.

Regarding the design mark, ,[8] I find that the overall effect is quite different from Defendants' logo, . The logos are different sizes, lengths, shapes, and colors,[9] and they utilize different fonts. One includes a picture, while the other does not. In fact, the only similarity is that they both contain the letters "h" and "g." I do not find any likelihood of confusion between Defendants' mark and Plaintiff's design mark.

Regarding the word mark, Plaintiff's registration covers the word "HG5." Even when compared to a shortened version of Defendants' logo, "HOG," I do not find that these two marks are sufficiently similar to create a likelihood of confusion. The similarities are that each word contains an "h" and a "g" and each is three characters in length. However, HOG spells a recognized English word, while HG5 does not; and HOG contains all letters, while HG5 has two letters and a number. The order of the letters is also important in this context because "Hg" is the chemical name for mercury, which relates to the product's use as an amalgam separator. This chemical name is explicitly included in "HG5" but is only implied by "HOG." Moreover, the exhibits submitted by both parties reveal that the word "HOG" does not usually appear by itself. It is almost always preceded by the word "Amalgam." Plaintiff has submitted only one screenshot, relating to the California Dental Association's 2015 meeting, which refers to the product simply

---

[8] I acknowledge that this representation contains the word "RAMVAC," which is no longer an authorized distributor of the Hg5. However, this image is an accurate representation of how the Hg5 design mark has appeared on Plaintiff's product labels. I do not rely on the presence of RAMVAC's name for the determination of dissimilarity.

[9] The Hg5 design mark contains the colors maroon, blue, black, and gray, whereas the Amalgam HoG mark contains only black and white.

as "the HoG." Overall, I find that the marks are not significantly similar, and this factor weighs heavily in favor of Defendants.

    ii.    *The Similarity of the Goods*

The parties do not dispute that the Amalgam HoG and the Hg5 are substantially similar pieces of equipment. Both are amalgam separators used to filter dental wastewater streams, and the Amalgam HoG has been designed to retrofit onto already-installed Hg5 systems. This factor weighs in favor of Plaintiff.

    iii.    *The Relationship Between the Parties' (a) Advertising and (b) Channels of Trade, and (c) the Classes of Prospective Purchasers*

These three factors are interrelated and generally considered as a group rather than individually. *See, e.g., Peoples Fed. Sav. Bank*, 672 F.3d at 14; *Pignons*, 657 F.2d at 488. The Amalgam HoG is being sold by the same distributors (DentalEZ and RAMVAC) that previously sold the Hg5 for six years, and it is being sold to the same customer base. The two amalgam separators appear to be competing for the same purchasers, in the same market. Defendants do not dispute these facts. Accordingly, the first two factors in this group weigh in favor of Plaintiff.

As for the third factor in this group, although the parties sell their products to the same class of purchases, it is important to note that these are sophisticated customers with particularized knowledge of the dental supply industry. Additionally, amalgam separators are specialized, long-lasting pieces of equipment, which are sold for upwards of $1,000 apiece. "If likelihood of confusion exists, it must be based on the confusion of some relevant person; i.e., a customer or purchaser. And there is always less likelihood of confusion where goods are expensive and purchased after careful consideration." *Astra Pharm. Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983) (citing *Pignons*, 657 F.2d at 489). I find that there is little likelihood that individuals in the business of selecting amalgam separators will be easily confused

by subtle similarities between Plaintiff's and Defendants' marks. This factor weighs in favor of Defendants.

    *iv.*    <u>*The Evidence of Actual Confusion*</u>

As evidence of actual confusion, Plaintiff has submitted three screenshots from the websites of dental supply companies that sell amalgam separators.  The first is from a company called "IQ Dental," and the screenshot shows a listing of the Hg5, with a bullet-point description and a photograph of the product, alongside a heading that reads "HoG Amalgam Separator."  The second two screenshots are from the website of an Australian company, "Dentec," and they show (1) a listing of the Amalgam HoG, with a photograph and a two-paragraph description, accompanied by a heading that reads "Hg5 Amalgam Separators"; and (2) a listing for an "Hg5 Amalgam Separator – Replacement Cartridge" alongside a photograph of the Amalgam HoG.

In response to these exhibits, Defendants submitted an email written by Sergey Kunin of IQ Dental and sent to Agnes Marie Pennington, Product Manager for DentalEZ products.  In this email, Kunin explains that IQ Dental sells both the Hg5 and the Amalgam HoG and is "well aware of the differences between the two units." (Docket No. 41-1 at 6.)  Kunin attributes the erroneous website listing to a "data entry mistake," and he states that IQ Dental is "taking steps to ensure [its] site correctly identifies both products going forward." (Docket No. 41-1 at 6.)

Based on Kunin's statement, I am convinced that the IQ Dental screenshot reflects a clerical error.  Regarding Dentec, however, neither party has presented supporting evidence to reveal the origin of the mistakes.  The apparent errors could reflect accidental data-entry issues, or they could be the results of actual confusion.  However, Defendants have also submitted an affidavit of Pennington, in which she asserts that neither she nor any members of her customer service department have received any questions from customers who are confused about the

respective origins of the Hg5 and the Amalgam HoG. I find that the Dentec screenshots, submitted without explanation or context, are not sufficiently substantial to show a likelihood that an appreciable number of customers are confused about the origins of the two products. This factor is neutral and does not weigh in favor of either party.

    v.    *The Defendants' Intent in Adopting the Mark*

"[A]lthough bad intent is not required for a finding of trademark infringement, the defendant's intent in adopting the mark is an appropriate consideration in the court's assessment of whether the public is likely to be confused about the actual source of the goods . . . at issue." *Peoples Fed. Sav. Bank*, 672 F.3d at 11-12 (internal quotation marks omitted). Likewise, the absence of a putative infringer's bad faith weighs against a finding of infringement. *See Boston Duck Tours, LP*, 531 F.3d at 30.

Plaintiff argues that Defendants' intent to infringe is clear, because Apavia was formed on the theft of Plaintiff's trade secrets. This allegation is the subject of a pending state court lawsuit, and I am not in a position to determine whether the claim has any merit. Although there is clearly ill will on both sides of this controversy, Plaintiff has submitted nothing beyond allegations regarding the nefarious nature of how the Amalgam HoG came into being. Moreover, I find it significant that Defendants' new logo is consistent with its line of other animal-themed products. RAMVAC has marketed at least seven other dental utility products, each with a different animal name relating to the product's use, accompanied by a picture of the animal (usually the head). The "HoG" element of the Amalgam HoG logo fits neatly into this line of products, suggesting Defendants' intent to continue with its own ongoing commercial scheme rather than to infringe on Plaintiff's reputation. I find that this factor weighs in favor of Defendants.

> vi. *The Strength of the Plaintiff's Marks*

The strength factor entails two types of analyses. One aspect involves the strength of the mark in its inherent capacity to function as a source identifier of goods; this goes to the viability of the mark regarding its entitlement to trademark protection. *See, e.g., Peoples Fed. Sav. Bank*, 672 F.3d at 15; *Boston Duck Tours, LP*, 531 F.3d at 15-17. The second aspect of the analysis involves commercial strength, shown by market factors relating to the mark's use in commerce. *See, e.g., Borinquen Biscuit Corp.*, 443 F.3d at 121; *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989).

Plaintiff's argument focuses on the commercial strength of its marks. Relevant considerations in this regard include "the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark." *Keds Corp.*, 888 F.2d at 222 (quoting *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989)). Plaintiff has been selling its amalgam separators for nearly fifteen years; the marks have been registered for thirteen years; and Plaintiff has won numerous awards for the Hg5. Defendants note, however, that the marks have historically been marketed alongside the names of distributors, including RAMVAC and DentalEZ. Thus, although consumers may be familiar with the Hg5 name and logo, they may not necessarily identify the mark as belonging to SolmeteX. I find, however, that Plaintiff's marks have been promoted, advertised, and used in the dental industry for a sufficient period of time that they are commercially strong, even though the "Hg5" logo is sometimes accompanied by the logo of an authorized reseller.

Defendants' primary argument focuses on the conceptual weakness of Plaintiff's word mark. Defendants contend that the word mark is merely descriptive and is, therefore, weak. A mark is descriptive if it "conveys an immediate idea of the ingredients, qualities or characteristics

of the goods." *Equine Techs., Inc.,* 68 F.3d at 544 (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1040 (D.C. Cir. 1989)). On the sliding scale of distinctiveness, descriptive marks occupy the lowest level that warrants protection. *See Boston Duck Tours, LP*, 531 F.3d at at 12. A descriptive mark is entitled to trademark protection only if it has acquired secondary meaning—consumers associate the mark with a particular product. *Equine Techs., Inc.,* 68 F.3d at 544 n.2 (citing *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir. 1993)); *see* 15 U.S.C. § 1052(f). Suggestive marks are one notch higher on the spectrum of distinctiveness. They are considered inherently distinctive, with no requirement to prove secondary meaning. *Equine Techs., Inc.,* 68 F.3d at 544 n.2 (citing *Boston Beer Co.,* 9 F.3d at 180). If a mark "requires imagination, thought and perception to reach a conclusion as to the nature of goods," it is suggestive. *Id.* at 544 (quoting *Blinded Veterans Ass'n,* 872 F.2d at 1040). The line between descriptiveness and suggestiveness can be a blurry one and is not easily drawn. In making this determination, the court considers "the mark in its entirety, with a view toward 'what the purchasing public would think when confronted with the mark as a whole.'" *Id.* (quoting *In re Hutchinson Technology Inc.,* 852 F.2d 552, 552-54 (Fed. Cir. 1988)).

As explained above with regard to the first element of the infringement claim, the Hg5 marks are entitled to a presumption of validity, because they have been successfully registered with the USPTO. *See* 15 U.S.C. § 1115(a). Although validity does not necessarily equal inherent distinctiveness—because the marks could have acquired distinctiveness through secondary meaning—on the record presently before me there is no indication that Plaintiff was required to submit evidence of secondary meaning in order to obtain its federal registrations.

Moreover, I find that the Hg5 word mark has a descriptive element but is, overall, suggestive. The "Hg" aspect of the mark is a descriptive term, because "Hg" is the chemical

symbol for mercury. However, although mercury is involved in the process of amalgam separation, the chemical symbol "Hg" by itself does not signify the process of amalgam separation. A small leap of imagination is required to travel from "mercury" to the process of separating mercury from dental wastewater. Furthermore, the "5" adds a suggestive element, as this number does not appear to correlate with an aspect of the product's purpose.

In this particular situation, however, the strength factor is affected by the fact that the only common aspect of Plaintiff's and Defendants' marks is the weakest element. *See* 4 *McCarthy on Trademarks and Unfair Competition* § 23:48 (4th ed.) ("If the common element of conflicting marks is a word that is 'weak' then this reduces the likelihood of confusion."). As noted above, the only similarities between the marks are that they both feature the letters "H" and "G." These letters form the most descriptive—i.e., weakest—element of Plaintiff's mark. This lessens the likelihood of confusion, because consumers will look past the more descriptive element of the marks to the other portions of the designs and will not be confused unless other aspects are also similar. *See id.* (citing *In re National Data Corp.*, 753 F.2d 1056, 224 U.S.P.Q. 749 (Fed. Cir. 1985)); *see Boston Duck Tours, LP*, 531 F.3d at 30. In this instance, the marks are not otherwise similar. The weakness of the "Hg" aspect is further underscored by the presence of at least two other amalgam separators currently on the market with names that include "HG."[10] Although Plaintiff's marks are worthy of protection and have been commercially promoted, I find that the strength factor weighs slightly in favor of Defendants, because the overlapping element is weak.

---

[10] These other amalgam separators are the "PUREVAC Hg System" and the "Rebec CATCH HG." (Docket No. 17-3 at 2-3.)

### 2. *Likelihood of Irreparable Harm, Balancing of the Equities, and Promoting the Public Interest*

"[A]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Voice of the Arab World, Inc.*, 645 F.3d at 32 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). This Court must balance "the hardship that will befall the nonmovant if the injunction issues" against "the hardship that will befall the movant if the injunction does not issue." *Mercado-Salinas v. Bart Enterprises Int'l, Ltd.*, 671 F.3d 12, 23-24 (1st Cir. 2011) (quoting *Borinquen Biscuit,* 443 F.3d at 115).

Plaintiff alleges that it is suffering irreparable harm because of the high likelihood of confusion between the Hg5 and Amalgam HoG marks. Plaintiff views this confusion as an immediate threat to its commercial reputation. Plaintiff also asserts that the relief sought will merely require Defendants to place new labels on their products; whereas Plaintiff stands to risk its longstanding, respected, and highly developed trademark. Defendants, however, will suffer harm if they are enjoined from marketing and selling their new product, which has already been introduced publicly to the dental community as the Amalgam HoG. Defendants further assert that they began using the Amalgam HoG logo in February of 2015, and Plaintiff was aware of this use but delayed in seeking judicial intervention.

Considering the significant dissimilarity between the marks and the overall low likelihood of confusion, I find that Plaintiff is not likely to suffer irreparable harm absent preliminary injunctive relief. I also find that to enjoin Defendants' use of the Amalgam HoG logo would cause significant hardship. The public interest does not require a preliminary injunction under these circumstances.

## Conclusion

For the reasons set forth above, Plaintiff's motion for preliminary injunction (Docket No. 2) is ***denied***.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**